May it please the Court. Good morning, Your Honors. I'm Greg Geo, appearing on behalf of Plaintiff Donna Corbello. I'd like to reserve five minutes for rebuttal. Just keep your eye on the clock, Counsel. Will do. I'd like to begin with four initial observations. First, this is not just another make-that's-my-movie case in which someone comes out of the woodwork following the success of a Can I turn it into five instead of four? Certainly. Could you tell me the status of, just describe in a sentence or two, the case against Mr. DeVito? Yes, Your Honor. The case against DeVito has been tentatively scheduled for trial in February 2015. And that's basically a straight breach of contract case? Well, it's for accounting to determine how much he supposedly owes to the plaintiff for his share of the proceeds from the play. And it is a breach of contract conversion. Because we're not hearing it, but that's a tremendously, obviously important piece of what's going on here. Is that... That's correct. That's correct, Judge Sack. And what is decided here is going to have... One other question. Yes, Judge Peay. You said Baya. Baya. Accounting breach of contract conversion. That doesn't sound to me like copyright. And fraud and constructive fraud. That's correct, Judge Baya. They're all common law causes of action based on pendant jurisdiction? Yes, Your Honor. With one exception, there is a claim for copyright infringement under foreign law. Because in the foreign countries where Jersey Boys has gone... Is that the hook for Federal jurisdiction as to the pendant jurisdiction claims? No. No, Your Honor. It's not. Is it a diversity case? Yes, Your Honor, it is. Okay. All right. Yes. Gotcha. Pardon me for interrupting you. Supposing you lost on everything related to the contract, right? Everything – would you then have a copyright claim? You mean if the contract was... I'm sorry. If the contract was determined to be valid, again, with DeVito and we go back to that case, what would we have? No. Supposing the contract were – we held that it has absolutely nothing to do with this case. Okay. It's just about something else. It has nothing – no rights at issue in this appeal are affected by that. Would you then have a copyright infringement case against these defendants? Against these defendants or against DeVito? These defendants. These defendants. If the contract has nothing to do with this case, then we would have a straight copyright claim. That's what I'm asking. Yes, Your Honor. We'd have a straight copyright infringement case against them. Right. Right. If, on the other hand, the 1999 agreement at issue was an assignment of DeVito's – I understand. Right. Then we would have an accounting claim against them that would not be copyright infringed. I understand. The accounting claim you refer to in the DeVito trial then is related to a copyright claim, is it? Well, in this circuit, Your Honor, as this Court has determined in Odo v. Reese, not really because a claim against a co-author for royalties is deemed not to arise under the Federal Copyright Act. I will say, however, that this is the only circuit in the United States in which that is the case. Since Goodman v. Lee in the Fifth Circuit some years ago, all of the other circuits have determined that that is – that Well, then, the bottom line then in terms of all of these questions, what effect does that trial have on this appeal? That trial has no effect on this appeal, but this appeal has a great effect on that trial. May have an effect on that trial. Very well. Thank you. Yes, Your Honor. You may continue. Thank you. So, in this case, rather than a plaintiff chasing after the defendants, Appellant Corbello was minding her own business when a plethora of public statements were made by the defendants themselves, most notably Jersey Boys director, Des McEnough, indicating that Jersey Boys was largely based on an unpublished biography of Tommy DeVito, which he called delicious and beyond description. And he said, as soon as I read this material, I knew that this was a story that really needed to be told. And in this case, unlike your normal run-of-the-mill copyright case, which rather than having to rely on access and substantial similarity to prove copying circumstantially, there is significant evidence of direct copying, including defendants' marked-up copy of the work with nearly 100 pages bracketed and annotated with such remarks as seen, that's a scene, exclamation point, and seen in jail. Thousands of pages of scripts, draft scripts, treatments. Kennedy, I'm sorry. Why? You seem to be describing a marvelous copyright infringement case. Yes, Your Honor. So what are we doing here talking about this contract? Well, the what this contract is and what it does for all of the people who have What are you talking about? Which contract? Let me tell you the one I'm talking about. It's to a letter that Mr. Maciocci and Mr. DeVito dated as of blank 1999, which refers to certain aspects of your life related to the Four Seasons, including by way of example, your creative contributions, biographies, events in your life. We'll call it the 1999 contract. Okay. We call it the 1999 agreement. Fair enough. All right. So the issue one with that agreement is whether that agreement actually covers the work. Right. And as you undoubtedly know, the defendants here have argued that it does not on grounds that they say that biographies in the agreement, the reference to biographies within the materials does not encompass the work, which is a biography. And instead, they focus on a waiver provision that's in the agreement and say that copyright claims that any of their works might produce, and that that waiver is somehow binding on the plaintiff or constituted a non-exclusive license, and therefore, plaintiff has no cause of action against them for copyright infringement. I know there's parole evidence involved here. Yes. Is there anything to suggest no, that's too strong a way to ask the question. So the question is, does the parole evidence show or tend to show that the people who wrote this knew about the work, this work? The parole evidence, which incidentally, importantly, was created in 2011 for their motion for summary judgment and has to do with the attorneys involved and the principals characterizing the agreement at the time, they all state in declarations that were aware of the work. Is there evidence that they were? So leave all of that out. Is there evidence that they were aware of the ghostwritten autobiography? There is some evidence, and there is some question as to who knew what and when. And one of the things that we haven't been able to do, which we would like to do on remand, of course, is cross-examine these men about what they said in that parole evidence, because since it was submitted in connection with the summary judgment motion, we've had no chance to cross-examine them. Summary judgment motion, but there was no discovery? There was discovery. No, no, not on the summary judgment motion. We had completed the discovery process, and then they submitted this motion asking for the copyright claims to be dismissed. And it's in that context that they submitted their parole evidence that said that, hey, the work isn't covered by this agreement. We didn't even know about the work. But Judge Jones says, which seems to make sense to us, at least half of what he said, in the licensing context, he said that this agreement on its face, the 1999 agreement, was intended to be an exclusive license to DeVito that was drafted broadly enough to cover anything that he may have written about his life, any writings that he had an ownership interest in about his life, and that's why biographies appeared in there. But what is curious is then when he was examining our alternate claim, or really it's our primary claim, that is the alternate claim, that DeVito assigned his rights to Valle and Gaudio, at least the right to prepare and authorize derivative works based on the work, he said, well, you know, in that context, the agreement doesn't cover the work. He found the word biographies to be ambiguous, and he said that the ambiguity was whether it evidenced an intent to transfer a copyright-related interest. And because he said, well, you know, it's ambiguous as to whether that evidence is an intent to transfer, I'm going to look at their parole evidence. And, of course, we feel, Your Honor, that once he did this, once he found the agreement to be ambiguous, and once he took this parole evidence, which he ultimately found dispositive on our accounting claim, that at that point a trial in this action was required, and that it was reversible error under applicable New York law, and that it was reversible error for him to make that decision without sending the issue to the jury. And we're very blessed to have you, Judge Sack, here with us today because I know you're from New York and familiar with that law. And in preparing for this argument today, I've seen that you've issued at least two relevant decisions that deal with this directly. One of them... You better let me know afterwards what they are. Maybe this will ring a bell because it involves my home state of Texas. It was AEP Energy Services, the gas-holding company, versus Bank of America. And in that case, it was a New York case. It was up there in your Second Circuit Court of Appeals. But the agreements at issue were covered by Texas law. And you, in a footnote, footnote 14, I might add... I remember it well, yeah. You remember that footnote? It was a great footnote. And in that footnote, you said that the Texas standards were very similar to those of New York, and then you went ahead and outlined what the New York standards were. And to quote you, Judge Sack, you said, "...only where a contract is ambiguous may extrinsic evidence be used to determine the party's intent, and in such circumstances summary judgment is inappropriate." And this is... You're not the first one to say that. This is... We gave dozens and dozens of New York state cases and Second Circuit cases going way back, and they all say this, is that once you find an agreement or determine an agreement to be ambiguous, and once the judge looks at parole evidence, there is a material question of fact that exists about that parole evidence, about the credibility of the witnesses, et cetera, and only the trier of fact can assess that evidence and make the decision. You cannot have a summary judgment. That argument is a backup judgment for you, which you really want us to say this autobiography is included in the term biographies. Yes, Judge Bain. By plain language, right? Yes, Judge Bain. Is there a question of law that we can determine, or you're asking that that be sent back? I believe if the agreement is found to be unambiguous, that that determination of ambiguity, unambiguity, is a determination of law that you most certainly can make without sending it back. And if you find that the agreement is clear and that it unambiguously covers biographies and that the work of biography falls within that category, no, there's no remand needed for that. But what we really want with that, the reason is if biographies are included, because the grant that DeVito gave was exclusive and perpetual and irrevocable, we say that this was an assignment. You know, a copyright owner has five. An assignment or a transfer of ownership? An assignment. This is very strangely worded for that. What they say, what this transfers is certain aspects of your life related to the four seasons. That's what's transferred. And then it says by way of example. Now, if what you were doing was transferring a work, you would say we transfer the work, not by way of example, biographies. I mean, that's a very strange way to argue. I don't think so necessarily, Your Honor. I mean, there are several lines of cases that say that it is not necessary that you expressly state that something is an assignment or a transfer. I'm talking about the language here, of course. Right. I'm talking about this is a very, very odd way to say you have some particular right in a particular autobiography, a written autobiography, as opposed to my life story. Well, notice that they redefine parenthetically all about those categories as materials. And then they give rights in the materials, including rights to essentially make derivative works. Right. And if you look at all of the other items in that list besides biographies, Your Honor, they're all incorporeal. I mean, you don't have copyrights in your name and likeness, for example. The only thing in there that actually could be copyrightable is a biography. And so when they're – What's all the more reason is it not to think that they weren't thinking of it as being something corporeal, but something incorporeal? That is your story. But that's not what they've said. We have conflicting testimony on that. Jason Baruch, for example, one of the attorneys that was involved in drafting this stream of contracts, testified in his deposition that the wording was definitely broad enough to encompass the work. And so they are certainly using it as their springboard for extensive copying from the work and sublicensing and licensing those rights to other production companies and foreign companies. Of the work explicitly? No, of the materials and the subsequent downstream agreements, say. But not – they did not, based on this, sublicense the work itself. Is that right? Is that what you just said? No, we think that they sublicensed – they is a little ambiguous, but all these downstream parties, the rights were in all of the materials together. And it makes sense because we're talking about the play, which is using the names and likenesses and so forth of the people. I see that I'm running out of time. I'd like to reserve the rest of my time for rebuttal. You may do so, counsel. Thank you. We'll hear from the other side. Good morning, Your Honors. May it please the Court. My name is Daniel Maeda. I'll be arguing on behalf of the defendants of Pelley's Frankie Valley et al. I'll be arguing for the first half of the time, our allotted time, focusing on the accounting and the license issues. My colleague, David Korsnick, will take the balance of our time focusing on the foreign and domestic copyright. Counsel, your side has 20 minutes, and sometimes these plans don't always work out with the precision that you would wish, so. I understand that. Mr. Maeda, would you kindly get closer to the microphone? Sometimes your voice trails off, and if you want to effectively communicate this, please keep your voice up. Thank you very much. I'd like to start by answering a question that Judge Sack raised, which is, is there evidence that Valley and Gaudio, the contracting parties to the 1999 agreement, knew about the autobiography, DeVito's autobiography, at the time that they signed the contract? And the answer to that is clearly no. The plaintiff took the depositions of Valley and Gaudio and asked those questions, and the testimony was clear and did not contradict the declarations that they did not know about the autobiography at the time that they signed the contract. DeVito testified that he did not tell Valley and Gaudio about the autobiography at the time he signed the contract. In fact, the plaintiff's counsel very unusually insisted in this case that Valley and Gaudio not be shown a copy of the autobiography prior to their depositions very unusual in a copyright case where the defendant, Valley and Gaudio, are being accused of infringing a work to not even be able to see the work. But that was a stipulation that the plaintiff's counsel insisted upon and we complied with. So it's absolutely clear that the contracting parties did not know about the autobiography at the time of the 1999 agreement. In addition, the initial producer, John Scher, S-C-H-E-R, at whose insistence the 1999 agreement was entered into, he also didn't know about the autobiography. Now, if you think about that for a second, if this contract, 1999 contract, was supposed to transfer a copyright interest in something, an unpublished manuscript, why wouldn't it provide for the party at whose insistence the contract was entered into? Why wouldn't it provide for that document to be provided? And neither Scher nor Valley nor Gaudio ever knew about or received a copy of that autobiography. The other aspects of the 1999 agreement that make it implausible to be an assignment of a copyright interest, it's not accompanied by a short-form assignment of copyright as is typical in these kind of transfer documents. Why is that? Because the transferee, the assignee, wants to have a short-form assignment that they can record with a copyright office to put the world on notice of their new copyright interest. What, in your view, does the word autobiographies plural mean? It could mean events in a person's life. It could mean life story. In the entertainment context, a biography or a bio often means career highlights or the background of the person. It's not defined. Admittedly, it's not defined. If that's your determination of what biographies mean, to include events in a person's life, why do you have in the contract after the word biographies the term events in your life? Isn't that superfluous and tautological? One thing we know is that that term biographies was not intended to refer to a written copyrighted work. How do you know that? Because none of the parties who was contracting for that knew about that particular Isn't that an issue of fact? I don't believe it is, Your Honor. If you look at all of the evidence in this case points to this not being If Mr. DeVito testifies, I did not tell Valli and Gaudio about the autobiography, would a jury of his peers be bound to believe him? If it gets to the jury, the jury certainly could evaluate that issue. They could say he's lying through his teeth. And the reason that he didn't mention autobiographies was because if he did mention the autobiography, he'd have to split it with Woodard or Corbello. But, Your Honor, there is a copyright law policy which provides that a transfer of copyright ownership cannot be provided inadvertently or unintentionally. And that's what would be the situation here if you found The whole issue there is whether we should interpret biographies plural to include a biography. Well, I don't believe that's quite the issue. But there are Isn't that what biographies plural means, more than one biography? Biographies can certainly mean more than one biography. That's certainly what the dictionary would tell us, right? Certainly. Any dictionary in 1999 would tell us that. There are plenty of definitions of biographies to include things other than a written work. It could be an oral People ask me. You mean people ask me for my bio and they really don't want to have a 300-page thing on my life? Because I didn't know that. I would have given them a whole autobiography. That could be, Your Honor. You have to look at what the context is and the extrinsic evidence provides. And this case is simply not the kind of This contract is simply not the kind of contract that transfers a copyright ownership interest in anything. And the cases are very clear. You can't do that unintentionally or inadvertently or by mistake or by imprecise language. Well, it did purport to grant an exclusive license, did it not? An exclusive right to use the name, likeness, et cetera, which is important because Valli and Gaudio wanted to create a Four Seasons musical but did not want the other members of the Four Seasons to do a competing musical. What kind of a right do I have then? Let's just take the word biographies out. What kind of right do I have in the events of my life that I have to license? It's not actually clear whether Valli and Gaudio had to get anything from Mr. DeVito because they could do a musical based on They're getting an exclusive right to nothing. Well, they could do things in the public domain, certainly. But you never want to take a chance that someone who you're writing about or you're producing a play or movie about might come back and sue you and say, wait. I understand that. My question is why does it have to be exclusive? Look, New York, the only right of privacy, so-called, that New York recognizes is misappropriation. I could see being concerned about misappropriation. But I don't know how you can say, maybe you can, but I don't understand why you would say it's exclusive where all I'm doing is protecting myself from a lawsuit. The lawyers testified, and it's in the papers, that the reason for the exclusivity is they did not want Valli and Massey, I'm sorry, DeVito and Massey to do something in competition with this project. They wanted them to exclusively provide to Valli and Gaudio the right to do a musical. That's what it's about. That's the non-competition part is the exclusivity that they were going for. That's what the lawyers testified about. Counsel, help me with Section 101, the definition of transfer of copyright ownership. Yes. Assignment mortgage exclusive license for any other conveyance and so forth. Isn't that what we have here? Again, if you believe that, if you, contrary to all the extrinsic evidence in the case, and again, the plaintiff has not presented any extrinsic evidence that would support the idea that this document, the 1999 agreement, was, in fact, an assignment of copyright ownership. But if you assume that it has some bearing upon the autobiography, which was not mentioned, referred to, understood, delivered, et cetera. Notwithstanding the term autobiographies in the plural. Biographies. Biographies. Right. Excuse me, biographies in plural. Yes. You still have to intend to transfer ownership of something, and that was never done. And that's clear that it was never intended to be done and was never, in fact, done. It wasn't provided. It wasn't delivered. There's nothing about it that suggests that copyright ownership was transferred. It doesn't. The exclusivity, again, goes to the idea of the noncompetition, as compared to the release language, which is also contained in that agreement, which is an extremely broad release that encompasses anything that might possibly happen in the future with regard to the play that was being contemplated. Mr. Maillet, is it your point that the language that the producers here wish to use and incorporate means something other than they are getting ownership of those ideas and concepts which are part of the man's life? Again, they could have done this simply by public domain. They're trying to protect themselves, very common in the entertainment industry, to get waivers, consents, grants, promises to cooperate, et cetera, so that they could avoid this very thing which has happened, which is someone comes out of the woodwork and sues on the basis of some event or work that they did not know about. That's why these things are entered into. And the word materials in that first, in that second paragraph on ER 623, what are the materials that are meant in events of your life? That's not a material. Names and likenesses, that's not a material. But biographies can include a material, can it not? It can. It might be letters that DeVito wrote to Valley. It could be anything that Mr. DeVito had in terms of his release. They did not want to be sued by anything dealing with it in a copyrighted context. Kennedy. But my question is, does the word materials cover anything in that paragraph other than the material of an autobiography? It covers your creative contributions. That doesn't sound much like a material. It could be because of events in your life. It covers names and likenesses. The only material, touchable thing is the autobiography. Mr. DeVito was a musician and performed on a lot of those songs. They were concerned as well that he might make a claim, because they were going to use the songs, the four-season songs in the musical. That would be reduced to a disc of some sort, right? He might say, hey, that was my guitar riff or whatever, make an argument about that. So that's part of it as well. I see that my time is running short. I will just simply say that this ---- Counsel, notwithstanding your plan, I need to follow up. I'm looking at page 624, the second page of the agreement. In the bottom paragraph, it says, Grant to us the exclusive right to use. And I also come back to the definitional provision of transfer of copyright ownership, and it says, Provocation of the exclusive rights comprised in the copyright. Why don't we have to read those in pari materia? I'm sorry. I'm missing it. I see the first exclusive right. Exclusive right is on the first line of the bottom paragraph on page 2 of the agreement. I see that, yes. All right. And I'm also looking at the words exclusive rights in the definition in section 101, transfer of copyright ownership. Simply because of the use of the word exclusive? Exclusive rights. Again, what are the rights that are exclusively being dealt with? The materials. Again, there's nothing in this 1999 agreement that says that the undisclosed, unpublished autobiography that DeVito had was being dealt with in a copyright context and given to Valle and Gaudio. They didn't know about it. Well, put that off to a side. In terms of trying to determine whether this is a license or an assignment or a transfer of copyright ownership. Yes. We have to deal with the language that's in the agreement itself. Absolutely. And I see the same term used in page 2 of the agreement as is used in the statute. Is that just by coincidence? Or should we regard those two iterations as somehow related to each other? I think they would be related if the intent was to transfer a copyright interest, in which case it would have said something different. Does the word copyright appear in the? Only in the waiver release portion of this agreement. But not in anything having to do with the transfer? Not at all. Not at all. I should like to have some time. Thank you, counsel. Thank you so much. I would like to ask the deputy clerk to add 15 seconds, please. All right. I'll do it. I'll do it at the back end. The clock kept running down after you left the podium. I'll give you a few seconds more. Go ahead, counsel. Thank you. Good morning, Your Honors. My name is David Korsnick of Miller Korsnick Summers on behalf of the defendants and appellees. Verbatim copying. That's what he told Your Honors we did. Let's look at what that is. The plaintiff. I apologize, counsel, but the clock hasn't started yet. Now it's started. Very well. Thank you very much. Let's look at what that is. The plaintiff, according to his expert, says that there are 90 similarities between these works, much as we've seen in Lickfield, 100 in Sumod, 300 in Narell. Narell is a very important case here because it's really quite similar to what we're dealing with. Of those 90 similarities, 29 reference verbatim word use. Of those 29. Is your argument, I'm sorry, but you're arguing that there was no copyright infringement? Correct. In other words, the branch of the motion that I'm. Did the district court ever really get to that? No. Did the district court decide that in the first place if we agree with your colleague? The court should have decided in the first place because we are calling. We asked the court at the motion to dismiss phase. But it didn't. But it didn't. And we can say you do it. You could. You have that ability. And I think that one should. Courts in New York and in California, district courts are very experienced in engaging and managing copyright infringement cases. They do it all the time and they know where to go. And they. Of course, this is a court in Nevada. Here we're in Nevada. That's right. But the problem is that in districts that do not manage these cases, they manage them as if they are commercial cases. I see. Even though the extrinsic test, or in New York we say the test of copyrightability, is a strictly judicial task that must be undertaken before. Even if the case is to get to a jury. In other words, the court has to carry out that, quote, filtering process to remove from the body of the work for consideration all of those items that are nonprotectable expression. Now, a court has to do that at one stage or another. This Court did not do that. And at one point I did at the motion for summary judgment say to the judge, you know, I argued the motion for summary judgment. And I said the issue is a purely legal one. It's not factual at all. The book is the book. The play is the play. They can both be read. And courts generally do and will make that determination. He looked at me and said, that is a task that I do not have to undertake. So the court never did evaluate the two works. But the truth of the matter is, and what was the consequence of that? The consequence of that was that we were sent packing for years and 30-plus depositions, only two of which we asked for. Now, in the term way in which these cases are managed, that is the threshold issue. And unless those things are segregated out at the outset, then those districts that are not familiar with this will guide these cases into extremely costly and inefficient and wasteful enterprises. Now, I want to just make the point here that we're dealing here with an historical work, a biographical work. Not only are we dealing with a biographical work, but we're dealing here with a claim against defendants who actually lived the events that are being accounted here. It's not as if it's a fictional thing. It's not as if it's even historical fiction. It is the events that happened to the defendants themselves that they are being told they may not retell. Let me run through some of these similarities. 29 of the 90 are verbatim words. Of those 29, 10 are single words, words like cool, words like bullshit, when they're actually said by different people. Nobody owns those kinds of things. Of those 29, again, five turn on two-word phrases such as revolving door to describe recidivism of people going back in and out of jail. Cliche, unprotected, common phrase. Norell tells us this and a thousand other cases that this learned circuit has made clear cannot deserve protection. Time machine, social movement, walks away. Walks away is an interesting phrase. Walks away describes Massey when he left the group. All of the members of the group speak of his exit in that way. They use the same word. They don't know why he left. He gave no reason. He just walked away. That's the way the family talks about it. And if DeVito then tells the writer Woodard that he walked away, Woodard writes it down and now Woodard comes back or his estate and claims that we stole that from him. But that's the way the family tells the story about itself. That's the way the band speaks of its experiences. And that's a copyright infringement according to these people. Eight of the 29 are three-word phrases, things like in the projects, a little party, he wants out. Three of them have no words in common. They're just abstractions. Three of them are verbatim, near verbatim brief sentences that are actually spoken by real people at a particular time. They are events that happened in the lives of the people who are being sued. The shooting in the car scene. There's more than one book here or source of information. There were treatments by other people that the authors saw. There were books about the Four Seasons that they saw, published and unpublished. And the same shooting in the car scene, for example, appeared in two of them. And those stories were told to the writers of the play, of the musical, Rick Ellis and Marshall Brickman, by Frankie and Bob themselves. So here's the irony of the whole thing and this is what's so amazing. In the shooting in the car scene appears in all these other treatments. The shooting in the car scene is an example of two thugs who stage a false murder so that they can extort money. Counsel, please conclude. Your time is... I'll conclude with this point. Before one is shot, he says something, yeah, asshole, what are you going to do about it? And then the guy shoots him. That event happened to Frankie Valli. It was his story. It wasn't even something that happened to DeVito. DeVito knows about it only because Frankie told him about it. Frankie tells him that story. DeVito then tells it years later to the writer. The writer writes it down and now Frankie can't tell that story again. That's what this lawsuit is about. Thank you, counsel. Your time has expired. Thank you, counsel. Thank you, Your Honor. Mr. Aguillo, you have some reserve time. Thank you, Mr. Congressman. May it please the Court, I don't have much time left, but there are several misstatements in there that I certainly would like to correct. But first an observation. I got excited when my colleague, Counsel Maeda, said that they didn't even need this agreement because it didn't cover the work. If this agreement doesn't exist, the 1999 agreement does not cover biographies and does not cover the work, what we have is a group of infringers. Because DeVito has testified multiple times in interrogatory responses, deposition testimony, that he never authorized them to use and did not assign to them the work, any rights in the work. So we've got a fact issue there that needs to go before the jury if they say that they've got some right to do this copying, to use this material, but it's not in the agreement. And the person that they allegedly got the right from swears that he never did so. Now, what's getting, keeps getting somehow undefined here is, is are we talking about the copyright in the work or are we talking about everything else that's involved or are we talking about both? Because they could certainly, supposing the work didn't exist, supposing somebody had said this is terrible and threw it in a shredder. Are you saying this, this contract would have no meaning then? No. We say it does have meaning and it covers the work. I was just. No, no. I'm saying the work disappears. There was no work. It turns out there wasn't. You entered the contract. They didn't know about it. Are you saying that this contract becomes meaningless? I'm not sure I'm following you, Your Honor. You, suppose, your whole thing is that the work, you've got rights with respect to the work. Correct. I'm saying supposing it turned out there was no work. It did not exist. Well, if the work did not exist, we would not be standing before you here today with a copyright. That's exactly my point. Right. But I'm asking would the contract have meaning if there was no work? Not with respect. Well, yes, it would. It would because it would still, if they weren't aware that the guy had a biography at the time they wrote this, the contract would still mean, in our opinion, if you've got one, it's ours. You would mean that you could do this play without being, for one, without being sued for misappropriation. That's one thing it would mean. It would mean, for example, that they have to cooperate. You can use their story. You could use their bio, which is a three-piece page. If there were, the notion that if there were no work, this contract would be essentially meaningless, I don't understand. Well, no, and that's not a position that we're taking, that the contract would be meaningless. But we're saying that the contract does cover the work. And this release language, which was another point that I wanted to clarify, the release that is in there is a release of copyright claims in works derived from the materials. So it's not just a waiver of any copyright. Works derived from material? The way that materials and works are defined. Point to that passage in the document itself, please. I don't have the document before me, but if you look at the definitions, Your Honor, of works and materials in there, and you look in the release. It's the third from the bottom. I'm sorry. What page? Page 625. Page 625. You waive any right to inspect or approve works, et cetera, et cetera, that's where the word copyright appears. That's right. That's not where the waiver provision is that they're talking about. Here it is. It's on page 625, page 3 of the agreement. A waiver by DeVito of any claim that. What paragraph? Well, I don't know. A waiver of any claim that works, which are defined as things created from the materials at the beginning of the agreement, infringe, among other things, any copyright or other personal property right. You may further waive any claim in connection with the materials or works including? Is that what you're saying? I am saying that the way that works and that the waiver provision is. Pardon me, counsel. Would you kindly point to the language you just? Is that in? Maybe your co-counsel can help us here. We're trying to pin down precisely what passage of the 1999 agreement you are referring to. I'm referring to the waiver clause. And where is that? That they are highlighting. It is on page 3 of the agreement at ER 625. Okay. And where on that page? I don't have the page in front. Maybe one of your counsel can help you with it. But I have it written what it says. All right. No, no, no, no. Give it to him. You waive any right. This is the 1999 agreement. This is the 1999 agreement. All right. You waive any right to inspect or approve the works. All right. Or any use of the materials in connection therewith. All right. How are the works defined? Let's go back. You have to go back to the beginning of the agreement where they define what the works are. And if you look at the bottom of page 2, here you go. Last paragraph on page 2. In consideration of foregoing payments, blah, blah, blah, blah, you grant us the exclusive right to use and incorporate the materials in one or more theatrical productions. And they define all the ways they can use it. And then it says, parenthetically, collectively works. So the presence of works as the works is defined in relation to the materials. And the materials are the five things that you mentioned at the beginning, Judge Sack, that are covered, including creative contributions, events in your life. Right, right, right. So, in other words, there is no copyright waiver that doesn't pertain to the works, meaning Jersey Boys and the things that they created. And there may be no cause of action for libel or slander, and yet that's still in there. That's right. And the libel and slander claim. Copyright, if any. I'm sorry? They're talking about copyright, if any. They don't know if there's a copyright. Agree. Okay. No problem there. No question there. We definitely agree on that. Second, I would like to say that they just claim that there was no extrinsic evidence on the other side that we presented that contradicts theirs, and that's not true. A, we had Donald Farber, a veteran of 50 years in the entertainment law industry, who is the author and editor of Entertainment Industry Contracts, the ten volumes by West that every entertainment lawyer uses, and he said that unlike their expert, Elliot Brown, stated that there is no industry understanding of the word biographies that differs from what you and I believe it to be, and he felt that this was an assignment of copyright interests in biographies. And his closing quote was, you know, if it walks like a duck, quacks like a duck, it's a duck, and biographies are biographies, period. So... Thank you, counsel. Your time has expired. Oh, I don't have 2.34 more minutes? No. You have exceeded your time by over two minutes, through the grace of the presiding judge. Thank you very much. Thank you, Your Honor.     Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.
judges: O'SCANNLAIN, Sack, BEA